WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Alexia Colter, | No. CV-13-01294-PHX-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Alexia Colter seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits under the Social Security Act (the Act). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Local Rule of Civil Procedure 16.1. For the following reasons, the Court affirms the Commissioner's decision.

**I.      Procedural Background**

On September 29, 2010, Plaintiff applied for disability insurance benefits under Titles II and XVI of the Act. (Tr. 13.)[1] Plaintiff originally alleged disability beginning August 2008, but later amended the disability onset date to January 2010. (Tr. 167-82, 46-47.) After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for reconsideration, she requested a hearing before an

---

[1] Citations to "Tr." are to the certified administrative transcript of record. (Doc. 16.)

1    administrative law judge (ALJ).  After conducting a hearing, the ALJ issued a decision

2    finding Plaintiff not disabled under the Act.  (Tr. 10-29.)  This decision became the final

3    decision of the Commissioner when the Social Security Administration Appeals Council

4    denied Plaintiff's request for review.  (Tr. 1-6); *see* 20 C.F.R. § 404.981 (explaining the

5    effect of a disposition by the Appeals Council.)  Plaintiff now seeks judicial review of

6    this decision pursuant to 42 U.S.C. § 405(g).

7    **II.     Administrative Record**

8         The record before the Court establishes the following history of diagnosis and

9    treatment related to Plaintiff's health.  The record also includes opinions of state agency

10   physicians who examined Plaintiff and reviewed the records related to Plaintiff's

11   impairments, but who did not provide treatment.

12        **A.     Treatment Records**

13             **1.     Treatment Related to Headaches**

14        After receiving some treatment for migraine headaches (Tr. 373, 648-50), on

15   referral from Dr. Veena Gulaya, Plaintiff started seeing neurologist Dr. Nirmal Aryal in

16   November 2009.  (Tr. 427-29.)  Plaintiff reported having headaches "for years" and

17   complained of recent tingling in her hands.  (Tr. 427.)  Plaintiff complained that she had a

18   "daily headache" with "photophobia, phonophobia, . . nausea, [and] dizz[ness]."

19   (Tr. 427.)  On examination, Dr. Aryal found irritated nerves in Plaintiff's hands and arms

20   (Tinel's and Phalen's positive).  (Tr. 428-29.)  She also noted that all of Plaintiff's

21   sensory modalities were within normal limits, she had full motor strength and a normal

22   gait.  (*Id.*)  Dr. Aryal diagnosed migraine headache, chronic daily headaches, and carpal

23   tunnel syndrome, she prescribed Topamax and Relpax and continued use of a wrist splint,

24   and she ordered diagnostic tests.  (Tr. 427-29.)

25        In January 2010, after Plaintiff's alleged disability onset date, Plaintiff reported to

26   Dr. Aryal that her headache was "much better" and she denied having daily headaches.

27   (Tr. 425-26.)  Dr. Aryal's treatment notes contain no indication that Plaintiff had

28   ancillary symptoms (such as nausea or dizziness) related to her headaches.  (Tr. 425-26.)

1   Plaintiff also reported that her hands were doing better.  (Tr. 425.)  Dr. Aryal made no

2   significant findings on examination of Plaintiff.  (*Id.*)  Plaintiff's gait was normal, her

3   "modalities" were within normal limits, and she was alert and oriented.  (*Id.*)  Dr. Aryal

4   described a recent MRI of Plaintiff's brain (Tr. 436) as "normal," recent nerve

5   conduction and EMG testing as "normal," and opined that Plaintiff was "doing very

6   well."  (Tr. 425-26.)

7       Electro-diagnostic testing of Plaintiff's arms and hands conducted in March 2010

8   was also normal.  (Tr. 474.)  There was no evidence of peripheral neuropathy or distal

9   nerve impairment.  (*Id.*)  In May 2010, Dr. Aryal noted that Plaintiff had a "chronic daily

10  headache," which Plaintiff described as "mild" and said that her headache would "come[]

11  and go[]," but it was "not completely resolved."  (Tr. 423.)  The treatment notes do not

12  indicate that Plaintiff suffered ancillary symptoms related to her headaches.  (Tr. 423-24.)

13  Plaintiff also reported continued tingling and numbness in her hand.  (*Id.*)   On

14  examination, Dr. Aryal found that Plaintiff's sensory modalities were within normal

15  limits, she had full strength, her gait was normal, and she was alert and oriented.  (*Id.*)

16      In August 2010, Dr. Aryal again described Plaintiff as having a history of a

17  "chronic daily headache."  (Tr. 421.)  Plaintiff reported that her headache was "much

18  better" and she had one headache per month.  (Tr. 421.)  The treatment notes do not

19  identify any ancillary symptoms related to Plaintiff's headaches.  (Tr. 421-22.)  Plaintiff

20  reported that her hands were still numb and tingly, but Dr. Aryal noted that a nerve

21  conduction study had ruled out carpal tunnel syndrome.  (*Id.*)  On examination, Plaintiff

22  was alert and oriented, had full strength, her sensory modalities were within normal

23  limits, and she had a normal gait.  (Tr. 421.)  In October 2010, Dr. Aryal noted that

24  Plaintiff's "chronic daily headache seem[ed] to be doing very well on Neurontin," and

25  that her hand symptoms had improved.  (Tr. 563-65.)  The treatment notes do not

26  describe any ancillary symptoms related to Plaintiff's headaches.  (*Id.*) In December

27  2010, Plaintiff's primary care physician Dr. Olu Orinsile noted that Plaintiff's headaches

28

1    had returned, but did not state the frequency of Plaintiff's headaches or describe any

2    ancillary symptoms.  (Tr. 588.)

3         In March 2011, Plaintiff reported to Dr. Aryal that her headache was "much

4    better" and that her hands had also "improved significantly but [were] still tingly at

5    times."  (Tr. 510.)   The treatment note does not describe the frequency of Plaintiff's

6    headaches or identify any ancillary symptoms.  (*Id.*)  Dr. Aryal described Plaintiff's

7    neurological examination as "stable," noting that her sensory modalities were within

8    normal limits, she had a normal gait, and full strength in her extremities.  (Tr. 510-11.)  In

9    April 2011, Plaintiff reported to Dr. Olinsile that her headaches were worse, but the

10   treatment note does not state the frequency of the headaches.  (Tr. 580.)

11        In August 2011, Plaintiff reported to Dr. Aryal that her headaches were "much

12   better," and reported ongoing tingling and numbness in her hands.  (Tr. 679.)   The

13   treatment note does not indicate the frequency of Plaintiff' headaches and does not

14   indicate that Plaintiff had any ancillary symptoms when she had a headache.  (*Id.*)

15   Plaintiff's neurological examination was unremarkable.  (Tr. 679-80.)  On examination,

16   Plaintiff was alert and oriented, had full strength, her sensory modalities were within

17   normal limits, and she had a normal gait.  (Tr. 680.)  Dr. Aryal did not make a specific

18   diagnosis related to Plaintiff's reported tingling and numbness in her hands.  (Tr. 679-

19   680.)  In October 2011, Plaintiff reported to Dr. Aryal that her headaches "were much

20   better," but she continued to experience tingling and numbness in her hands.  (Tr. 676.)

21   The treatment note does not state the frequency of Plaintiff's headaches or identify any

22   ancillary symptoms.  (Tr. 676-77.)  On examination, Plaintiff was alert and oriented, her

23   sensory modalities were within normal limits, she had full strength, and a normal gait.

24   (Tr. 676.)

25        On January 17, 2012, Plaintiff reported to Dr. Aryal that her headaches were

26   worse and she was having daily headaches.  (Tr. 673.)  Plaintiff said she was under a lot

27   of stress following her breast cancer diagnosis.  (*Id.*)  She was scheduled for surgery the

28   next day.  (*Id.*)  The treatment note does not describe any ancillary symptoms related to

1   Plaintiff's headaches.  (Tr. 673-74.)  Plaintiff reported bilateral tingling and numbness in

2   her lower extremities.  (Tr. 673.)  On examination, Plaintiff was alert and oriented, her

3   sensory modalities were within normal limits, she had full strength in her extremities, and

4   a normal gait.  (Tr. 674.)

5   **2.      Treatment Related to Plaintiff's Knee, Back, and Joint Pain**

6         On referral from Dr. Gulaya, in November 2009, Plaintiff saw physician assistant

7   (PA) Brian Nelson for knee, back, and hip pain and stiffness.  (Tr. 468-70.)  PA Nelson

8   assessed osteoarthritis of the hip, collagen vascular disease, and patellofemoral

9   syndrome.   (Tr. 469.)   In November 2009, X-rays of Plaintiff's hips showed "mild

10  degenerative changes" (Tr. 478), and X-rays of Plaintiff's knees showed evidence of

11  degenerative osteoarthritis more severe on the right than the left.  (Tr. 477.)  A November

12  2009 X-ray of Plaintiff's lumbar spine showed "mild degenerative disc disease at L2-3."

13  (Tr. 476.)

14        After the January 2010 alleged onset of disability, Plaintiff saw PA Nelson every

15  few months for joint pain, and he diagnosed osteoarthritis.  At these visits PA Nelson

16  made findings on examination, including tenderness of the spine and cracking and

17  swelling of the knee, and he prescribed pain medication.  (Tr. 465-67 (January 2010),

18  461-64 (March 2010), 458-60 (June 2010), 455-57 (September 2010), 451-54 (October

19  2010), 568-70 (December 2010).)  At several subsequent visits in the fall of 2010, PA

20  Nelson recommended that Plaintiff consult a physical therapist, but the record does not

21  include any physical therapy records.  (Tr. 451-54, 568-70.)

22        X-rays of Plaintiff's knees in October 2010 showed moderate osteoarthritis in her

23  right knee and mild to moderate osteoarthritis in her left knee.  (Tr. 472.)  In October

24  2010, An X-ray and MRI of Plaintiff's spine showed "mild degenerative disc disease" in

25  the lumbar spine (Tr. 471), and "mild spondylitic disease at L4-L5 and L5-S1."

26  (Tr. 602.)   In October 2010, X-rays of Plaintiff's sacroiliac joints were "normal."

27  (Tr. 473.)

28

1    Plaintiff continued seeing PA Nelson in 2011.  PA Nelson continued to make the

2  same findings on examination — including pain, swelling, and crepitus in the knees, pain

3  on motion of the hip, and tenderness on palpation to the lumbrosacral spine — and

4  prescribed pain medication for osteoarthritis of the hip and knee.  (Tr. 565-67 (March

5  2011), 726-28 (June 2011), 721-25 (August 2011), 716-20 (November 2011).)  At these

6  appointments, PA Nelson recommended a consultation to consider epidural injections for

7  Plaintiff's back pain.   (Tr. 567, 719, 723, 728.)   There are no medical records

8  documenting that Plaintiff received these injections.  However, the record reflects that

9  Plaintiff had Supartz knee injections.  (Tr. 451-53.)

10    During 2010, Plaintiff also saw her primary care provider Dr. Onisile for joint

11  pain.  (Tr. 590.)  Dr. Onisile noted that Plaintiff reported neck, shoulder, back, and hip

12  pain.  (Id.)  He also noted right hand weakness with occasional loss of grip.  (Id.)  On

13  examination, Dr. Onisile found tenderness in Plaintiff's cervical and lumbar spine and

14  sacroiliac joint.  (Id.)  He also noted pain with lumbar flexion, right hip rotation, and right

15  shoulder adduction.  Plaintiff had a positive straight-leg test and mild tenderness of her

16  right forearm and wrist.  (Tr. 590.)  In November 2010, Dr. Onisile's examination was

17  essentially the same, but he also found 11/18 trigger points and noted radiating pain into

18  Plaintiff's upper and lower extremities.  (Tr. 589.)  During 2011, Plaintiff continued

19  seeing Dr. Onisile who noted that Plaintiff reported back and joint pain at some visits.

20  (Tr. 578, 579, 584, 585, 586, 587.)

21    On July 19, 2011, Plaintiff saw rheumatologist Dr. Michael Fairfax for low back

22  pain and general musculoskeletal pain.  (Tr. 662.)  On examination, Dr. Fairfax found no

23  musculoskeletal tenderness or deformity, no muscle weakness or gross neurologic deficit,

24  and no synovitis on joint examination.  (Id.)  However, he noted a positive ANA.[2]  (Id.)

25

26    [2]  A positive ANA reading might indicate that a patient has an autoimmune disease
such as lupus, however, a positive reading alone does not indicate such a diagnosis.  A
27  relatively small percentage of such patients actually have an autoimmune or connective
tissue disease. See American College of Rheumatology, Antinuclear Antibodies (ANA),
28  https://www.rheumatology.org/Practice/Clinical/Patients/Diseases_And_Conditions/Anti
nuclear_Antibodies_(ANA). (last visited February 12, 2015).

In September 2011, Dr. Fairfax diagnosed low back pain (lumbago) and abnormal blood chemistry; he prescribed medication (Plaquenil) to treat a possible autoimmune illness or connective tissue disorder.  (Tr. 661.)  Plaintiff followed up with a nurse practitioner in December 2011.  (Tr. 659.)  In November 2011, X-rays of Plaintiff's hands showed a small foreign body on her right thumb but otherwise no significant osteoarthritis. (Tr. 740.)  In November 2011 X-rays of Plaintiff's feet and knees showed degenerative changes consistent with osteoarthritis (Tr. 741), and moderate osteoarthritis in Plaintiff's "medial right knee."  (Tr. 742.)

### 3. Treatment Related to Plaintiff's Breast Cancer

In November 2011, a biopsy taken from a lump in Plaintiff's breast was positive for breast cancer.  (Tr. 697.)  Plaintiff had a mastectomy and chemotherapy in late 2011 and early 2012.  (Tr. 690-92, 755-75, 785-96.)   Plaintiff also had follow-up surgery related to the mastectomy.  (Tr. 745, 749.)  Plaintiff had follow-up visits through March 2012.  (Tr. 755-75, 785-96.)

### B. Medical Opinion Evidence

### 1. Kathleen Handal

In December 2010, as part of the administrative proceeding, state agency physician Dr. Kathleen Handal reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity (RFC) Assessment.  (Tr. 267-69.)  Dr. Handal opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds, that she could stand or walk four hours in an eight-hour workday, and that she could sit for six hours in an eight-hour workday.  (Tr. 267.)  She also found that Plaintiff could frequently balance and stoop, occasionally kneel, crouch, and climb ramps or stairs, but that she could never crawl or climb ladders, ropes, and scaffolds.  (Tr. 267-68.)  She further found that Plaintiff should avoid hazards (heights and machinery), and concentrated exposure to extreme heat, wetness, humidity, and vibration.  (*Id.*)  She also found that Plaintiff should avoid moderate exposure to noise and fumes, odors, dust, gases, and poor ventilation.  (Tr. 268.)

1   Dr. Handal explained that Plaintiff's obesity, osteoarthritis of the knee, and mild
2   degenerative disease in her back and hips resulted in her postural limitations, and that her
3   obesity, neurological records, and prescribed medications resulted in her environmental
4   limitations.  (Tr. 268.)

5   **2.     Michael Keer**

6   On June 1, 2011, as part of the administrative proceeding, state agency physician
7   Dr. Michael Keer reviewed Plaintiff's medical records and completed a Physical RFC
8   Assessment.  (Tr. 613-15.)  Dr. Keer opined that Plaintiff had the same work-related
9   limitations as those outlined in Dr. Handal's opinion.  (Tr. 613-15.)  Dr. Keer also found
10  Plaintiff unlimited in her ability to use hand or foot controls.  (Tr. 613.)  Dr. Keer
11  explained that Plaintiff's obesity, osteoarthritis of the knee, and degenerative changes in
12  her back and hips supported the identified postural limitations.  (Tr. 614.)  He also
13  explained that Plaintiff's neurologic examinations supported his findings of
14  environmental limitations.  (Tr. 615.)  Dr. Keer also noted that the additional medical
15  records did not show a worsening of any of Plaintiff's conditions.  (*Id.*)

16  **3.     Michael Fairfax**

17  On March 8, 2012, Plaintiff's treating physician, Dr. Fairfax completed a Medical
18  Assessment of Ability to do Work-Related Physical Activity assessing Plaintiff's work-
19  related physical limitations.  (Tr. 783-84.)  Dr. Fairfax opined that Plaintiff could not
20  work on a regular and consistent basis due to her pain and fatigue.  (Tr. 784.)  He found
21  that Plaintiff could sit between three to four hours in an eight-hour day, lift and carry
22  between fifteen and twenty pounds, stand or walk less than two hours in an eight-hour
23  day, and occasionally use her hands and feet (with frequent reaching).  (Tr. 783.)  He also
24  found that Plaintiff could occasionally bend, climb, stoop, balance, and crouch, but never
25  crawl or kneel.  (*Id.*)  He further found that Plaintiff should avoid unprotected heights,
26  and she was moderately limited in her exposure to marked changes in temperature,
27  humidity, and moving machinery, and she was mildly restricted in her ability to drive and
28  her exposure to dust, fumes, and gases.  (Tr. 784.)  Dr. Fairfax described Plaintiff's pain

and fatigue as "moderately severe," and noted those symptoms could reasonably be expected to result from objective clinical or diagnostic findings in the record. (Tr. 784.)

### 4. Nirmal Aryal

In March 8, 2012, Plaintiff's treating neurologist Dr. Aryal completed a Medical Assessment of Ability to do Work-Related Physical Activities assessing Plaintiff's work-related limitations. (Tr. 747-48.) Dr. Aryal opined that Plaintiff was "unable to work at this time," noting that Plaintiff reported having headaches on a daily basis for one to three hours with no relief and also had several ancillary symptoms (shortness of breath, dizziness, fatigue, and pain). (Tr. 747.) Dr. Aryal opined that Plaintiff should avoid unprotected heights and moving machinery. (*Id.* at 748.) She also found Plaintiff moderately limited in her exposure to marked changes in temperature, humidity, and dust, fumes, and gases. (Tr. 748.) She opined that Plaintiff was mildly limited in her ability to drive. (*Id.*) Dr. Aryal described Plaintiff's restrictions as "moderate," meaning that they affected but did not preclude her ability to function. (*Id.*) Dr. Aryal also stated her opinion regarding Plaintiff's headaches was based on Plaintiff's reports, and that the limitations identified in her assessment could not "reasonably be expected to result from objective criterial or diagnostic findings" documented in Plaintiff's medical record. (Tr. 747-48.)

### 5. Brian Nelson

On April 12, 2012, Plaintiff's treating PA Brian Nelson wrote a letter "to whom it may concern," stating that Plaintiff's functional impairment caused by chronic musculoskeletal pain could not be measured objectively and would have to be based on Plaintiff's reports of pain and fatigue (noting that Plaintiff consistently reported her symptoms). (Tr. 893-94.) He also noted that he could not determine the impact of Plaintiff's symptoms in relation to Plaintiff's activities, including work. (Tr. 893.)

## III.   Administrative Hearing Testimony

Plaintiff was in her early forties at the time of the administrative hearing and the Commissioner's decision. (Tr 45.) She had a high school education and some college.

(Tr. 45, 48.)  Plaintiff's past relevant work included caregiver, cashier/checker, office clerk, and receptionist.  (Tr. 63.)  Plaintiff testified that she was unable to work due to knee and back pain, hand problems, migraine headaches, and breast cancer.  (54-55, 59, 61.)

When describing her daily activities, Plaintiff said that she got up, took her medication, showered, got dressed, said hello to her family, and then laid down in her room "pretty much all day."  (Tr. 51-52.)  Plaintiff also testified that she helped watch her grandchildren a few hours per day, and that the only housework she did was the dishes.  (Tr. 49.)  She also testified that she occasionally helped her nineteen-year-old son, who received disability benefits.  (Tr. 51.)  Plaintiff said that she could sit for one hour, stand for one hour, walk one-half block, and lift ten pounds.  (Tr. 50.)  Plaintiff said that she had daily tingling and numbness in her hands, which made it difficult to write and she "sometimes" had difficulty grasping.  (Tr. 55.)  Plaintiff described daily pain in her knees and daily headaches lasting an hour or more, and stated that her pain was getting worse.  (Tr. 55-56, 58-59.)  At the time of the hearing, Plaintiff was undergoing chemotherapy every two weeks for breast cancer.  (Tr. 52-53.)

Vocational expert Marilyn Kinnier also testified at the hearing.  (Tr. 62-72.)  She testified that an individual with the limitations adopted by the ALJ could perform Plaintiff's past work as an office clerk, cashier/checker, or collections representative.[3] (Tr. 63-64.)  The vocational expert also testified that such an individual could perform other work in the economy, such as a sales attendant, ticket taker, or photocopy machine operator.  (Tr. 64-65.)  In response to questions from Plaintiff's attorney, the vocational expert testified that an individual with the limitations identified by Dr. Fairfax, or who needed to lie down on a regular basis, leave work early, or miss work three to four times a month, would be unable to sustain regular employment.  (Tr. 67, 71-72, 65.)

/ / /

---

[3]  The ALJ's assessment of Plaintiff's limitations is set forth below in Section IV.

**IV.     The ALJ's Decision**

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits). To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

**A.     The Five Step Sequential Evaluation Process**

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her disability is severe. 20 C.F.R. § 404.1520(a)(4)(i) and (ii). If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five. At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is presumptively disabled. If not, the ALJ determines the claimant's RFC. At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education. 20 C.F.R. § 404.1520(a)(4)(v). If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

**B.     The ALJ's Application of the Five Step Evaluation Process**

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (Tr. 15.) At

step two, the ALJ found that Plaintiff had the following severe impairments, "breast cancer, headaches, alopecia, obesity, bilateral knee osteoarthritis, polyarthritis, and degenerative disc disease of the lumbar spine (20 C.F.R. § 404.1520(c) and 416.920(c))." (*Id.*)  At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17.)  The ALJ next concluded that Plaintiff retained "the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(a) and 416.967(b) . . . ."  (*Id.*)  The ALJ further found that Plaintiff was limited to occasional kneeling, crouching, crawling, and climbing ramps and stairs, and that "she must avoid occupations that require crawling or climbing on ladders, ropes, and scaffolds," and "must avoid exposure to fumes, temperature extremes, vibration, and extreme dampness and humidity."  (*Id.*)  The ALJ found that Plaintiff "could not be exposed to dangerous machinery and unprotected heights."  (*Id.*)

At step four, the ALJ concluded that Plaintiff could perform her past relevant work as an office clerk and collections representative.  (Tr. 21.)  Alternatively, at step five, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, she could perform other jobs that existed in significant numbers in the national economy. (*Id.*)  The ALJ concluded that Plaintiff had not been disabled within the meaning of the Act from January 1, 2010 through the date of decision, May 4, 2012.  (Tr. 24.)

## V.    Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

1    Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for

2    errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

3    Substantial evidence means more than a mere scintilla, but less than a preponderance; it

4    is "such relevant evidence as a reasonable mind might accept as adequate to support a

5    conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see*

6    *also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).   In determining whether

7    substantial evidence supports a decision, the court considers the record as a whole and

8    "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v.*

9    *Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted).

10    The ALJ is responsible for resolving conflicts in testimony, determining

11    credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

12    Cir. 1995). "When the evidence before the ALJ is subject to more than one rational

13    interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc.*

14    *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

15   **VI.    Plaintiff's Claims**

16    Plaintiff asserts that the ALJ erred by rejecting the opinions of treating physicians

17    Dr. Fairfax and Dr. Aryal.    (Doc. 19 at 13.)   She also argues that the ALJ erred in

18    discounting her symptom testimony. (*Id.* at 23.)   In response, the Commissioner argues

19    that the ALJ's decision is free from legal error and is supported by substantial evidence in

20    the record. (Doc. 20.)

21           **A.    Weight Assigned to Medical Source Opinions**

22    Plaintiff argues that the ALJ erred in weighing the medical source opinion

23    evidence.  (Doc. 19 at 13-23.)  In weighing medical source evidence, the Ninth Circuit

24    distinguishes between three types of physicians: (1) treating physicians, who treat the

25    claimant; (2) examining physicians, who examine but do not treat the claimant; and

26    (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v.*

27    *Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating

28    physician's opinion. *Id.*  The ALJ must provide clear and convincing reasons supported

1    by substantial evidence for rejecting a treating or an examining physician's

2    uncontradicted opinion.  *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An

3    ALJ may reject the controverted opinion of a treating or an examining physician by

4    providing specific and legitimate reasons that are supported by substantial evidence in the

5    record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at

6    725.

7         Opinions from non-examining medical sources are entitled to less weight than

8    opinions from treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an

9    ALJ generally gives more weight to an examining physician's opinion than to a non-

10   examining physician's opinion, a non-examining physician's opinion may nonetheless

11   constitute substantial evidence if it is consistent with other independent evidence in the

12   record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  When evaluating

13   medical opinion evidence, the ALJ may consider "the amount of relevant evidence that

14   supports the opinion and the quality of the explanation provided; the consistency of the

15   medical opinion with the record as a whole; [and] the specialty of the physician providing

16   the opinion . . . ."  *Orn*, 495 F.3d at 631.

17                    **1.     Weight Assigned to Dr. Fairfax's Opinion**

18        Dr. Fairfax opined that Plaintiff could not work on a regular and consistent basis

19   due to chronic joint pain and fatigue, and he described Plaintiff's limitations as

20   moderately severe.  (Tr. 783.)  He found Plaintiff limited to sitting less than four hours

21   per day and standing or walking less than two hours per day.  (Tr. 783-84.)  He also

22   found postural and environmental limitations.  (*Id.*)  Dr. Fairfax opined that Plaintiff was

23   limited to occasional use of her hands and feet.  (*Id.*)

24        Although Dr. Fairfax was a treating physician, his opinion is not entitled to

25   controlling weight because the reviewing physicians' opinions discussed in Section II.B.I

26   and II.B.2 were inconsistent with Dr. Fairfax's conclusions.  *See* 20 C.F.R. § 1527(c)(2)

27   and SSR 96-2p, 1996 WL 374188, at *2 (discussing when treating physician opinions

28   will be given controlling weight); *see also Bayliss*, 427 F.3d at 1216 (citing *Lester*, 81

F.3d at 830-31 (discussing applicable standards for evaluating treating physicians' opinions)).   Accordingly, the ALJ properly assigned Dr. Fairfax's opinion less weight by providing specific and legitimate reasons, which are supported by substantial evidence in the record.  *See Bayliss*, 427 F.3d at 1216.

The ALJ discussed the medical record (Tr. 17-18), and properly discounted Dr. Fairfax's opinion as inconsistent with the record and his treatment notes.  (Tr. 19.) *See Batson*, 359 F.3d at 1195 (an ALJ may discredit treating physicians' opinions that are unsupported by the record as a whole or by objective medical findings).  Plaintiff argues that the ALJ failed to sufficiently identify the evidence that was inconsistent with Dr. Fairfax's opinion.   (Doc. 19 at 14-15.)   However, the ALJ's statement that Dr. Fairfax's opinion was inconsistent with the medical record opinion is reasonably construed to refer to the evidence the ALJ discussed as part of her RFC analysis, which includes citation to various medical records that do not support the limitations Dr. Fairfax identified.  (Tr. 17-18.)

Dr. Fairfax stated that his opinion was based on Plaintiff's chronic joint pain and fatigue, but the objective evidence, which the ALJ cited (Tr. 17-18), showed that Plaintiff's osteoarthritis was mild to moderate.   (Tr. 476-78, 471-73, 740-42.) Additionally, while blood work from Dr. Fairfax's office indicated that Plaintiff might have an autoimmune or connective tissue disorder (Tr. 662), Dr. Fairfax did not specifically identify such a disorder as the basis for his opinion.  (Tr. 783-84.)   In addition, Dr. Fairfax's treatment notes, and the notes from his nurse practitioner, do not include any notations regarding fatigue.  (Tr. 659, 661, 662.)

The ALJ also discounted Dr. Fairfax's opinion because it was on a checkbox form without further explanation.   (Tr. 19.)   This is a specific and legitimate reason for assigning little weight to Dr. Fairfax's opinion.  *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").   The record reflects that Dr. Fairfax saw Plaintiff twice (Tr. 661-63), and that a nurse practitioner in his office saw Plaintiff once (Tr. 659), before Dr. Fairfax assessed

Plaintiff's functional abilities.   Thus, Dr. Fairfax's assessment is supported by few clinical notes and is unlike a situation in which a physician's otherwise brief opinion could be considered supported by a lengthy treatment history.  *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (an ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings").   Accordingly, the record supports the ALJ's conclusion that Dr. Fairfax's opinion was brief, conclusory, and inadequately supported by explanatory clinical findings, and the ALJ did not err in giving Dr. Fairfax's opinion little weight on that basis.  *See Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) ("[T]he regulations give more weight to opinions that are explained than to those that are not.").

Additionally, substantial evidence in the record, discussed in Section II.A, supports the ALJ's decision to discount Dr. Fairfax's opinions as unsupported by the record.   Although the record includes evidence that Plaintiff had pain, crepitus and swelling in her knees, pain on motion in her hip, and tenderness in her spine (Tr. 465-67, 461-64, 458-60, 455-57, 451-54, 565-67, 659, 716-20, 726-28), there is also evidence that Plaintiff was in no acute distress, had intact sensation, normal motor function, full strength in her extremities, and a normal gait.   (Tr. 410, 423, 510, 680, 677, 674). Treatment notes from Dr. Fairfax's office indicate that Plaintiff reported joint pain and stiffness (Tr. 659, 661, 662), and crepitus in the knees (Tr. 659), but on examination she was found to have "mild synovitis" in the joints of her hand or no synovitis (Tr. 659, 662), no musculoskeletal weakness or gross neurologic deficit (Tr. 662), intact range of motion in her upper extremities (Tr. 659), and no postural limitations.   (Tr. 659, 661.) Considering the record as a whole, the ALJ rationally concluded that the medical record did not support the limitations that Dr. Fairfax identified, and the Court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation."  *Magallanes*, 881 F.2d at 750; *see Batson*, 359 F.3d at 1198.

/ / /

### 2.    Weight Assigned to Dr. Aryal's Opinion

Treating neurologist Dr. Aryal opined that Plaintiff was "unable to work at this time," noting that Plaintiff had headaches on a daily basis for one to three hours with no relief and several ancillary symptoms.  (Tr. 747.)  Dr. Aryal also opined that Plaintiff should avoid unprotected heights and moving machinery, that she was moderately limited in her ability to participate in activities involving exposure to marked changes in temperature and humidity, and exposure to dust, fumes, and gases, and that she was mildly limited in her ability to drive automotive equipment.  (Tr. 748.)

The ALJ assigned this opinion little weight because it was unsupported by, and inconsistent with, the medical record.  (Tr. 19.)  Plaintiff argues that Dr. Aryal's opinion was entitled to controlling weight because she was a treating physician.  (Doc. 19 at 21.)  Although Dr. Aryal was a treating physician, her opinion is not entitled to controlling weight because the limitations she identified could *not* reasonably be expected to result from objective findings documented in the medical record.  (Tr. 748.)  *See* 20 C.F.R. § 1527(c)(2) and SSR 96-2p, 1996 WL 374188, at *2 (explaining that a medical opinion from a treating source is entitled to controlling weight when the opinion is a medical opinion, the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, *and* the opinion is "'not inconsistent' with the other 'substantial evidence' in the individual's case record.)."

Additionally, the ALJ gave clear and convincing reasons for assigning little weight to Dr. Aryal's opinion.  *See Lester*, 81 F.3d at 830.  The ALJ properly discounted Dr. Aryal's opinion as inconsistent with the medical record and Dr. Aryal's treatment notes.  (Tr. 18-19.)  *See Batson*, 359 F.3d at 1195 (an ALJ may discredit treating physicians' opinions that are unsupported by the record as a whole or by objective medical findings).  The ALJ cited Dr. Aryal's treatment notes documenting her findings that Plaintiff had full strength, and that she could walk on her heels and toes, and tandem walk.  (Tr. 19 (citing Admin. Hrg. Exs. 20F at 11-12 and 20F at 2).)  Additionally, Dr. Aryal's treatment notes reflect significant and ongoing improvement in Plaintiff's

1    reported headaches over the several years Dr. Aryal treated her. (Tr. 421-26, 510-11,

2    676-80.) Dr. Aryal noted similar improvement in Plaintiff's hand symptoms. (Tr. 425-

3    26, 564-65, 510-11.)

4        Plaintiff characterizes this evidence as "limited" reports of "some" improvement.

5    (Doc. 19 at 22.) However, Dr. Aryal's treatment notes reflect significant improvement

6    over a long period of time. (Tr. 421-26, 510-11, 564-65, 676-80.) Additionally, in

7    March 2012, Dr. Aryal opined that Plaintiff was having daily headaches with shortness of

8    breath, vertigo/dizziness, fatigue and pain (Tr. 747), however, the majority of Dr. Aryal's

9    treatment notes, including a treatment note from an appointment around the same period

10   as her March opinion (Tr. 673-74 (January 17, 2012 treatment note), do not mention

11   these symptoms. (Tr. 421-22, 423-23, 425-26, 501, 563-65, 673-74, 676-77, 679.) Thus,

12   the ALJ rationally concluded that Dr. Aryal's opinion was inconsistent with her treatment

13   notes. (Tr. 19.) Inconsistency with the record is a proper reason for discounting a

14   treating physician's opinion. *See Bayliss*, 427 F.3d at 1216 (a doctor's statement may be

15   rejected when her own notes, recorded observations, or recorded opinions contradict the

16   statement).

17       As the ALJ noted (Tr. 19), Dr. Aryal also stated that her opinion was based on

18   Plaintiff's self-reporting of her headaches and that the limitations Dr. Aryal described

19   could not reasonably be expected to result from objective findings documented in the

20   medical record. (Tr. 748.) Considering Dr. Aryal's own statements about her opinion, it

21   was reasonable for the ALJ to assign it little weight. *See Batson*, 359 F.3d at 1195 (ALJ

22   gave specific and legitimate reason for giving treating physician opinion minimal weight

23   by noting, in part, opinion did not include supporting objective evidence); *Turner v.

24   Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (fact that opinion was based

25   almost entirely on Plaintiff's self-reporting was a specific and legitimate reason to reject

26   the opinion).

27       Finally, even if the ALJ erred in assigning little weight to Dr. Ayral's opinion, any

28   error was harmless for two reasons. First, Dr. Aryal opined that Plaintiff was unable to

1    work, but whether a claimant is able to work is an issue reserved to the Commissioner.

2    *See* 20 C.F.R. § 416.927(d) (stating that the issue of whether a claimant is disabled is

3    reserved to the Commissioner and that "[a] statement by a medical source that [a

4    claimant] is 'disabled' or 'unable to work' does not mean that the [Social Security

5    Administration] will determine that [a claimant is] disabled."). A treating source's

6    "opinions on issues reserved to the Commissioner are never entitled to controlling weight

7    or special significance." SSR 96-5p, 1996 WL 374183, at *1.

8            Second, the RFC that the ALJ adopted accounted for Dr. Ayral's opinions that

9    Plaintiff should avoid unprotected heights and moving machinery, that she was

10   moderately limited in her ability to participate in activities involving exposure to marked

11   changes in temperature and humidity and exposure to dust, fumes, and gases, and that she

12   was mildly limited in her ability to drive automotive equipment. (*Compare* Tr. 748 *with*

13   Tr. 17 (concluding that Plaintiff should "avoid exposure to fumes, temperature extremes,

14   vibration, and extreme dampness and humidity" and should "not be exposed to dangerous

15   machinery and unprotected heights.").)

16           Therefore, the ALJ did not err in assigning little weight to Dr. Aryal's opinion and

17   substantial evidence supports her assessment of Dr. Aryal's opinion. Additionally, even

18   if the ALJ erred, any error was harmless. Harmless errors in the ALJ's decision do not

19   warrant reversal. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir.

20   2006).

21           **B.    Assessing a Claimant's Credibility**

22           Plaintiff also asserts that the ALJ erred by discrediting her symptom testimony.

23   (Doc. 19 at 8.) An ALJ engages in a two-step analysis to determine whether a claimant's

24   testimony regarding subjective pain or symptoms is credible. *Garrison v. Colvin*, 759

25   F.3d 995, 1014-15 (9th Cir. Jul. 14, 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028,

26   1035-36 (9th Cir. 2007)).

27           "First, the ALJ must determine whether the claimant has presented objective

28   medical evidence of an underlying impairment 'which could reasonably be expected to

produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain.  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work.  *See* 20 C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for finding the claimant not credible.[4]  *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036).  "'The clear and convincing standard is the most demanding required in Social Security Cases.'"  *Garrison*, 759 F.3d at 1015

---

[4]  The Ninth Circuit has rejected the Commissioner's argument (Doc. 20 at 22 n.4; Doc. 24) that a lesser standard than "clear and convincing" should apply.  *Garrison*, 759 F.3d at 1015 n.18.

(quoting *Moore v. Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). Because there was no record evidence of malingering, the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's subjective complaints were not wholly credible. Plaintiff argues that the ALJ failed to do so.

### 1.    Plaintiff's Daily Activities

The ALJ discounted Plaintiff's symptom testimony because her daily activities, which included childcare, were not as limited as would be expected considering Plaintiff's complaints of disabling symptoms. (Tr. 20.) Plaintiff asserts that this was not a clear and convincing reason for discrediting her symptom testimony. (Doc. 19 at 9.)

The Ninth Circuit has stated that a claimant's participation in normal daily activities "does not in any way detract from [her] credibility as to [her] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). As the Ninth Circuit has explained, "[o]ne does not need to be 'utterly incapacitated' in order to be disabled." *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Rather, the daily activities must involve skills that could be transferrable to a workplace and a claimant must spend a "substantial part of [her] day" engaged in those activities. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (finding that the ALJ erred in failing to "meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations.").

The Ninth Circuit has found that the ability to care for a child may be evidence of a claimant's ability to work. *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) ("The ALJ could reasonably conclude that Molina's activities, including walking her two grandchildren to and from school, attending church, shopping, and taking walks, undermined her claims that she was incapable of being around people without suffering debilitating panic attacks."); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (the ALJ properly found that the claimant's claim of totally disabling pain was undermined by her testimony about her activities, such as attending to the needs of her two young children.

1     In discrediting Plaintiff's symptom testimony, the ALJ noted that Plaintiff dusted,

2    grocery shopped, and drove.  (Tr. 20.)  She also noted that Plaintiff helped care for her

3    grandchild (made him breakfast, dinner, and picked him up from school).  (*Id.*)

4    Plaintiff's ability to regularly care for her grandchild is a legally sufficient reason for

5    rejecting Plaintiff's symptom testimony.  *See Orn*, 495 F.3d at 639 (daily activities,

6    including child care, may be grounds for an adverse credibility"); *Rollins*, 261 F.3d at

7    857 (allegations of disability were undermined by activities such as tending to the needs

8    of two young children, cooking, housekeeping, doing laundry, shopping, and attending

9    therapy and various other meetings).

10                     **2.      Effectiveness of Treatment**

11        The ALJ also cited to Plaintiff's reported improvement to support her

12   determination that Plaintiff's symptom testimony was not fully credible.  (Tr. 20.)  In

13   assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness,

14   and side effects of any medication" and treatment, other than medication, that the

15   claimant has received for relief of pain or other symptoms.   20 C.F.R.

16   § 404.1529(c)(3)(iv) and (v).  Evidence that treatment can effectively control a claimant's

17   symptoms may be a clear and convincing reason to find a claimant less credible.  *See*

18   *Warre v. Comm'r, of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (stating that

19   "[i]mpairments that can be controlled effectively with medication are not disabling for

20   purposes of determining eligibility for SSI benefits.")  The record reflects significant and

21   ongoing improvement in Plaintiff's reported headaches over several years.  (Tr. 421-26,

22   510-11, 676-80.)  Additionally, Plaintiff denied having daily headaches.  (Tr. 421.)  The

23   ALJ did not err in rejecting Plaintiff's symptom testimony based on evidence that her

24   headaches responded to treatment.

25        Plaintiff argues that her reports of improvement only applied to her headaches, and

26   therefore, the effectiveness of treatment did not support the ALJ's rejection of her

27   subjective complaints of pain and fatigue.  (Doc. 19 at 24.)  The Court disagrees.  During

28   the administrative hearing, Plaintiff testified to having daily, worsening headaches lasting

an hour or more.  (Tr. 55-56, 58.)   However, the record evidence shows that Plaintiff reported significant and longstanding improvement in her headaches (and a frequency of only one per month) to Dr. Aryal.  This record evidence is inconsistent with Plaintiff's hearing testimony and this inconsistency is a significant fact in evaluating her overall credibility, not just her credibility as related to her headaches.  *See* SSR 96-7p, 1996 WL 374186, at *5 ("one strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

### 3.    Plaintiff's Demeanor

The ALJ also found Plaintiff's "demeanor while testifying at the [administrative] hearing was generally unpersuasive."  (Tr. 21.)  Plaintiff asserts that the ALJ's finding that her demeanor was generally unpersuasive is an invalid reason for discounting her credibility.  (Doc. 19 at 25.)  Plaintiff contends that her pain and fatigue from her chemotherapy should have been "readily apparent."  (*Id.*)  Although an ALJ's personal observations, standing alone, cannot support a determination that a claimant is not credible, they may form part of that determination.  *Fair*, 885 F.2d at 602; *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("The inclusion of the ALJ's personal observations does not render the decision improper.") (internal quotation omitted); SSR 96-7p, 1996 WL 374186, at *5 (stating that when "the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements.")  Accordingly, the ALJ did not err by discounting Plaintiff's credibility, in part, based on her demeanor during the administrative hearing.

## VII.    Conclusion

As set forth above, the ALJ's opinion is supported by substantial evidence in the record and is free of harmful legal error.

Accordingly,

1    **IT IS ORDERED** that the Commissioner's disability determination is

2    **AFFIRMED**.   The Clerk of Court is directed to enter judgment in favor of the

3    Commissioner and against Plaintiff and to terminate this action.

4    Dated this 12th day of February, 2015.

Bridget S. Bade
United States Magistrate Judge